Our third case and final case for this morning is Johnson v. Old Dominion University. Mr. Metcalf, whenever you're ready. Oh, I'm sorry, Ms. Metcalf, sorry. Good morning. May it please the court, my name is Hannah Rogers Metcalf and I'm here today with, I have the privilege to be here today to represent Mr. Lorenzo Johnson, the first is whether or not Old Dominion University violated the Americans with Disabilities Act when it required Mr. Johnson to undergo a fitness for duty examination. The second question before the court today is whether or not Old Dominion University violated Title VII when it retaliated against Mr. Johnson for engaging in protected activities. I will address these two questions in that order unless the court would prefer for me to address something in particular. I will go through the questions in that order. Briefly, Your Honors, this case, as the court is well aware, involves Mr. Johnson who is an African American man who was an IT specialist at Old Dominion University. Over the course of his employment, Mr. Johnson developed a reasonable belief based on information that he was receiving that he was being treated differently than his similarly situated white counterpart at the university. Based on that belief, he filed a grievance in September of 2013 alleging that he was being required to clock in and clock out in a different manner than his white counterpart. He filed the grievance through the normal channels at the university and requested documents through the normal channels that he believed would support, either prove or disprove his claim, but they were necessary in order to resolve his complaint. In particular, specifically, he was requesting e-mails. He and his counterpart were required to e-mail upon arrival and departure. Those documents were not provided and he began a prolonged effort akin to something that happens often in discovery where he tried a variety of different methods in order to obtain those documents. He filed multiple Freedom of Information Act requests. He filed multiple grievances. This continued over a series of months until ultimately he filed an equal opportunity claim in front of the EEOC in the spring of 2014. Shortly thereafter, the university sent him a notice that he was being placed on administrative leave with pay and was not allowed to return to work until he had completed a fitness for duty examination. Importantly, that notice specifically stated that the reason he was being referred for this examination, it was a full forensic psychological evaluation, was because he had filed grievances. It detailed his FOIA request, his state FOIA request, state court filing where he filed a petition for writ of mandamus asking for documents. His grievances that he filed properly through the university. Is there, Ms. Metcalf, is there anything that would make the way and manner in which one pursues grievances somehow out of bounds for under the ADA for a fitness for duty exam? I mean, the protected activities I understand may relate to Title VII. I don't think, I may be wrong, but I don't think the concept of protected activities necessarily relates to the ADA claim. Maybe I'm wrong, maybe that's your position that it does, but I guess my question is, just because what he was doing was in the parameters of grievances, does that mean that there's no basis to request that exam for that reason alone? I think that's an excellent question. I think that's one of the difficulties in this case because you have the interplay of both Title VII and protected activities under Title VII as well as the ADA. What the ADA says is you can request a fitness for duty examination if you have a reasonable, based on objective evidence that there is a condition that prevents the employee from performing essential functions of their job or they're a direct threat. This court has held, and other circuits have also echoed this statement, that the employer has to have a legitimate non-discriminatory reason to doubt their capacity. So it has to be based on objective evidence about their capacity to perform their job. It can't be for a discriminatory reason. That makes sense, but what's the evidence in the record that there was not a reasonably objective basis for the employer to believe that communication between your client and his co-workers had not been impaired? I know there's an argument communication is an essential function. I'd rather you not address that now. I'd like to hear what's the evidence that there wasn't a reasonable basis to believe that communication had been impaired. Certainly. ODU, after the fact, in justifying the fitness for duty examination, relied on this communication argument and in a little bit in their original statement to Mr. Johnson and to the forensic examiners, mentioned this communication issue. The evidence that they point to specifically relates to a performance review that he received in 2011. They point back to this problem with one professor, Mr. Kalbergi, who he had communications issues with. There's no dispute about that in the record. But that evidence is back in a performance review from 2011-2012. His most recent performance review, which he received in October of 2013, and was signed off by his direct supervisor, Dr. Ardalan, the dean, Dean Yoakum, and Ms. Williamson from HR, who were all the three people who were involved later in the fitness for duty examination and his termination. That performance review in October of 2013, which is a month after he files his initial claim, rated him satisfactory or a contributor level on all essential elements. And with regard to customer services, stated that he had met all the requirements in terms of ability to communicate effectively. So your argument is based on the language I'm familiar, I don't have it in my fingertips, but the performance reviews that are in the record? Yes, Your Honor. The performance, the most recent performance review, he received satisfactory ratings across the board and there was a comment that he was handling himself with regard to effective communication. He did have a professional development goal of increasing his ability to communicate, but he also had a professional development goal of increasing his ability to use Oracle software. There was nothing else in his personnel file that documented an inability to communicate. And with a fitness for duty examination, there needs to be objective evidence of an inability to communicate. And I point the court to the unpublished decision in Corsi, which was also a university, there were repeated documented instances in that professor's file where students and colleagues had observed objectively this person's irrational behavior, his outbursts, his threats, and they had done an independent investigation. There are other cases in other circuits where the person was interviewed by a psychologist. There's nothing in this record that supports the statement that he was unable to effectively communicate other than an old, two-year-old performance review. If that performance review had been more recent, would that be enough to suggest a fitness for duty exam? I think it then creates a question, Your Honor, that upon review by this court or a fact finder would have to make a determination. But in this case, the most recent review say they all say he can communicate, and there's nothing else in the record. I mean, the example you just posited about a professor evincing irrational behavior, being abusive, that kind of stuff, there doesn't appear to be any of that in this record. So I guess I'm a little bit concerned about whether just refusing to speak to somebody is enough to get hauled before a psychiatrist or psychologist. Well, and the cases from the Fourth Circuit talk about, and other circuits say, minor inefficiencies or just personality difficulties and those sort of things are not sufficient to warrant a fitness for duty examination. The fitness for duty examination, it needs to rise to a level where it impairs their ability to perform an essential function, and it has to be based on objective evidence. And not being able to get along with somebody, being annoying because you're filing grievances, there's no dispute that Mr. Johnson was probably a thorn in the side of O.D.U., but that doesn't rise to the level of what is contemplated by the ADA for a fitness for duty examination. That might be a cause for discipline, I suppose, right? But that's an entirely separate thing than suggesting he needs to go see a doctor. That's exactly right, Your Honor. When I think about a fitness for duty examination, I'm thinking about a driver or a pilot who needs to have their eyes checked so they can perform their job. Here, they're saying he can't communicate. Well, what does being able to talk to your colleague have to do with a full forensic psychological examination? It's quite a leap to go from, you don't get along with one of your colleagues, to we're going to complete a full-day or multi-day psychological evaluation. So, if someone were to view this record, and this employer viewed the way he was utilizing the grievance process as being in bad faith and for harassment, would your position be – I know you don't concede that, by the way – that that could be something that would justify termination, but not a fitness for duty evaluation? In other words, if someone is in bad faith utilizing the grievances, would they have been allowed to terminate him? I think if there were clear evidence that somebody was in bad faith utilizing the grievance process and was acting outside a good faith exercise of protected activity, then I think you would look to this court's en banc opinion, and I think it was Boyer-Liberto, and they talk about what is an appropriate form of protected activity. And there's a long line of precedent from this court about protected activities in the form of grievances or even acts of civil disobedience. And the court has said repeatedly, if Mr. Johnson or another litigant has a reasonable belief – they don't have to be right, the court has said, they don't have to be right if they're being discriminated against – but if they have a reasonable belief that they are the victim of disparate treatment, discrimination, a hostile work environment, that is sufficient for them to survive a retaliation claim. And I believe, although the two are not exactly commensurate with the ADA in Title VII, that the same analysis would apply under the ADA with respect to a fitness for duty examination. However, that is not what we have here. Here, Mr. Johnson and the appellant concedes in the witness' estate, in the documents that they sent to the psychological examiner and to others, he never stepped out of the appropriate grievance process. The only time he did so was when he, in what he called an act of civil disobedience, refused to continue to send these email clock ins. And when asked about it, he said, I'm doing this so that I can create a controversy so that I can have this issue resolved and find a way to get these documents. And the record shows that when the documents were ultimately produced, he was being treated differently. The documents show that his colleague was not being required to clock in. It took him all this effort, sort of a pyrrhic victory, because he ultimately got the documents, but he lost his job, but he had a reasonable belief that he was being treated differently and was not being, he was being required to clock in when his white male counterpart was not being required to clock in. I can address the Title VII issues if the court would like, and I have about a minute and a half remaining, or if the court has any other questions, I'd be happy to answer those. Well, yeah, on the issue of pretext under Title VII, what evidence would you point to to, for the proposition that the termination or the adverse employment action was a pretext? You know, they gave the reason being failure to take the, you know, fitness for duty exam. What's the evidence that that wasn't the reason? Well, the ODU concedes in their brief that there are actually three adverse employment actions. We sort of lump them all together as one thing, but ODU says there were three adverse events. The first was administrative leave and the request for the fitness for duty examination. The second was the group two, and the third was termination. We say that's all sort of one event. The first thing we would say is it comes right on the heels of him filing his EEOC complaint, and that's not pretext, but that's the first thing to note, and after this whole series of things that he's filed. The number one exhibit would be the letter that the provost sent to Mr. Johnson, where she says, we're putting you on this fitness for duty examination because you filed the grievances. Then they send a letter to Dr. Sack, the examiner, and they detail paragraph after paragraph about why he's being asked to do this, because he's filed all these grievances, he's engaged in protective activities. Then there's those communications with Anthem that are in the sealed portion of the joint appendix where the HR specialists talk about how he's costing the university money and time, and they need a way to deal with him. They should have, Your Honor, as you suggested, Judge Diaz, perhaps gone through the normal disciplinary process, but instead they utilized, they chose to utilize his fitness for duty examination as a way to get rid of him. They knew he wouldn't do it. He objected to it. He filed a grievance about it. These are all examples of why, that their stated reason, oh, he just didn't come and do the exam, was pretextual. They were trying to find a way to get rid of him, as they stated in those call logs with Anthem, because he was costing them time and money, because they were having to deal with all these grievances and these complaints. I see my time is up. If there are no further questions. Thank you, Ms. Metcalf. Good morning, Your Honors. And may it please the Court. My name is Ryan Waddell on behalf of the Appalese. ODU did not violate the ADA or Title VII in this case. There are several factual discrepancies that I would like to address first. The requested clock-in, clock-in documents were provided to Mr. Johnson. They demonstrated that the white counterpart actually did have to clock-in and clock-out. They were provided in the months prior to him ever filing the September 2013 grievance. And they are the reason why he withdrew. Where is that in the record? It begins at 590 in the joint appendix. And those documents are the reason why he withdrew that September 2013 grievance, the day before the hearing. Now, that September 2013 grievance is no doubt important because it was related to all these documents. But that was not the first grievance he had filed. That was the seventh grievance he had filed. He started filing grievances as early as 2011. The first time he alleged retaliation against his direct supervisor was in November of 2012.  Now, the reason that these particular grievances were different were because he kept filing, withdrawing duplicative grievances and FOIA requests even though he had been given explanations in writing. We cannot provide these personnel records. He went to a general district court seeking the writ of mandamus.  seeking the writ of mandamus. And his request was denied. He went back to request the same documents. Assuming, just to follow that through, and I know you could point to some other examples that you would criticize, that may be misuse of the grievance process. But how is that the basis for a fitness for duty exam? It's not at all the basis for the fitness for duty exam. It's one of nine objective factors that ODU listed. Collectively, I believe they begin on JA 450. But I'll go through those factors. Refusal to communicate with his direct supervisor. Inability to work and interact with others. They perceived him to be a cyber security threat. There was an incident where he filed a police report with the Old Dominion police that his computer had been hacked. The Old Dominion police were going to start an investigation. He told them to hold off because he wanted to investigate further. Several days later, he called the university police and told them that he had put trap software on his own computer to make sure that people weren't logging into his computer. So that kind of goes towards a cyber security threat. That police report is on JA 620. And then there was some job performance questions and his ability to use sound judgment on the job. There were issues where his inability or refusal to communicate with certain faculty was preventing things from getting done in a timely manner. And this had gone on for about two years. There were multiple reports made by his co-workers that made him feel uncomfortable. And I know this is trivial compared to those, but there was a lack of eye contact during communication. So how is all of that consistent with his performance evaluations? His performance evaluations begin detailing communication issues from the very first one in 2011. But Ms. Metcalf brought out that his most recent evaluation suggested no issues that were noted by his employer other than a stated aspirational goal to continue to improve his communication skills. So what you just listed is a variable laundry list of things that you would think would be reflected in the reports. Well, most of those things occurred after that performance evaluation was issued. All of the FOIA requests, there were seven of them. And then there were six additional grievances from September 13th onward. Because this was the 2012-2013. So a lot of these events happened after September 2013. So they wouldn't have been in that performance evaluation. And the one that is also particularly troubling was him acting out of still disobedience. So with respect to the requests for the exam, what you just listed is all of that in that written document? It is. Where is that in the JA? It's on 450. And I believe it also can be found on 456 to 458. And it's also on 459 in the letter that they sent to him. And if you read all of those things, they don't say anything about because of his grievance activity. They say that by and through your grievance activity and withdrawing and refiling duplicative grievances and ignoring our guide, our, we've told you many times that we can't give you these documents. It's through that behavior and that inability to sort of process why. And they talk about a resolution. And their concern was that you're filing all these grievances for no purpose, for no reason. And the one grievance that did qualify for a grievance hearing is the September 2013 one. And again, he withdrew that grievance the day before the grievance hearing. So let me stop you there. So I just want to make sure I understand your JA sites because I have some of these documents. And from I think the 456 to 58 is the letter to Dr. Sack, correct? Yes. Okay. And I know it does contain a good bit of information. The 459 is the April 17th notice to Mr. Johnson himself. Yes. And it doesn't list all those things. No, I think JA 450. It's the referral form. That's the referral form. Yes, it really goes into those things. Yeah, on 451 to 453. Okay. Thank you. Yes, Your Honor. So turning to that, we have a situation where, and I think the grievance hearing that he had for his ultimate termination, the grievance hearing officer noted, and I think that's 464 to 487, that his preferred method of communication was using the grievance procedure. He refused to interact with the supervisor. He refused to go into any meeting with any kind of supervisory figure without recording. And it became a breakdown that had started in 2011, but it had deteriorated to the point of Old Dominion had legitimate concerns with his well-being and with his ability to perform an essential job function. And I think all of those factors constitute legitimate, objective, nondiscriminatory reasons to cast doubt on his ability to perform an essential function, which communication is. And under the ADA, that is one of the permissible reasons to order a fitness for duty evaluation. The entire reason for it is to rule out the possibility that there's some unknown impairment that is affecting this employee's performance. And I don't know that it would be good precedent, necessarily, to set where a university could have just fired him multiple times over, but instead Old Dominion elected to give him every benefit of the doubt until it reached a point where there was no communication. Because notably, after he withdrew that grievance and he saw the documents, the clock-in documents that showed that he was having the same clock-in requirements, which he had been doing since 2011, why he chose to raise it two years later, I do not know. After that, instead of stopping, he files the EEOC charge. He files... He doesn't leave the documents, right? Yes. He questioned their authenticity and wanted metadata. Yes, and he asked the Employment Dispute Resolution Office for the Commonwealth's DHRM, their Human Resources Office, to open an investigation of retaliation. And to them, that was a signal of, we've worked with him, we've tried to do everything, but there's some disconnect, and it's been just simple, I don't agree with your decision on this, and that's why they ordered the exam. And then when the exam... Opposing counsel represented that they ordered the exam because they knew that he wouldn't attend. I think that's contradicted by his deposition testimony and in the record because he confirmed that he would attend two times. Now, this turns to the Title VII retaliation piece of the equation. I say that there was three adverse actions because on page 288 of the JA, that's plaintiff's deposition testimony, he believes that there were three adverse actions. The ordering of the fitness for duty examination and suspending him, writing him up for failure to attend, and then obviously his termination. Now, those objective factors that I just listed demonstrate that the fitness for duty evaluation wasn't ordered in retaliation for him engaging in protected activity because he'd engaged in protected activity for the last two years. The disciplinary issue was they scheduled an appointment the first time. He did not attend. They rescheduled. He confirmed that he was going to attend, did not attend. Before he confirmed that he was going to attend, he asked if they could move it to a closer medical provider of his choosing. They couldn't do it at the time, but he confirmed that appointment, did not attend, so he was given written discipline  That is his failure to follow instructions after confirming the appointment. That is the real reason why he was given that discipline. Mr. Waddell, this is a summary judgment case, and so I guess the question is, looking at the evaluation referral form, why couldn't a reasonable juror conclude that the focus of that referral form was primarily emphasizing his utilization of the grievance procedure and not these other communication issues? And therefore find that this is all pretext. Well, to show pretext, you would have to show but-for causation for starters, and the referral form is just a place that lists out these factors conveniently together. The records replete with other evidence from the Old Dominion Police Report, from his first response to the grievance activity to his first performance evaluation, where he's fighting over what communication is. That's part of my customer service, but it's in detailing all these events that just kept building, and the record, I don't know that a reasonable juror could find that there to be pretext, because the reason that he was ordered for these things is borne out in the record many times over, and the reason that he was disciplined was because he agreed to attend an evaluation and did not. The reason he was terminated is because DHRM policy 1.60 recommends termination for accumulation of written discipline, and he was given a second written disciplinary notice because the third fitness for duty evaluation he skipped. Then he confirmed that he would go to a fourth one. They even scheduled a provider that was closer to him, and then he did not go. He was specifically advised that you must schedule and attend. He did not do that, and he admits that he did not do that in his deposition testimony. On page 288 of his deposition testimony, we ask him, what evidence is there of pretext for retaliation? He says, my own written words, my own statements. I think this court's holding in Maryland Eastern Shore, it's Foster versus Maryland Eastern Shore, that's my favorite recitation of but-for causation, because it's the real reason. In that case, that burden falls on a plaintiff to show that the employer's proffered reason is false and that the real reason was retaliatory animus. In this record, there is simply nothing other than Mr. Johnson's self-serving and conclusory statements to try to make that showing. This court, I think, its precedents bear out that that burden of showing but-for causation is taxing. And the courts in Dash versus Mayweather, the court says that we must rely more on conclusory statements or inference on inference or a mere scintilla of evidence. So the roundabout way to get back to Your Honor's question is, I believe that would be maybe a scintilla of evidence. But when read carefully and when read in the context of those 13 paragraphs, it shows that retaliation wasn't the but-for reason. It just shows that through these grievance activities, and particularly the later ones, it showed a level of behavior that made ODU legitimately question if there was some kind of condition preventing him from understanding or why they couldn't give him these documents or preventing him from being able to work constructively and communicate with his supervisors. And, again, I think they could have fired him numerous times over. They did not do that. They tried to go through the grievance process. They tried to do all of these things. And eventually, especially with that September 2013 grievance that he withdrew on March 19th, the day before the hearing, it came to a point of, we're trying to work with him through this grievance process, but he's not allowing us to resolve these issues. And Title VII doesn't immunize an employee who's engaged in protected activity from just simply not doing what his employer says or arguing with his employer or causing his employer harassment. The fact that he is engaged in protected activity doesn't mean that he has to stop doing his job functions. And in this particular case, his protected activity that got so amplified after September 2013 clearly demonstrated that he just refused to communicate or work with anybody or work constructively or work effectively with others. And that's the reason that he was sent, because they wanted to rule out the possibility that there was some sort of impairment that might possibly be accommodated, because there was no other explanation that ODU could come up with of why he was acting this way. So I will say that I do believe the Title VII issue and the ADA issue are separate, but they're very distinct. The Title VII adverse job actions, only one of them depends on the ADA analysis, and that's whether the exam was ordered based on legitimate, objective, nondiscriminatory reasons. The suspension or the first disciplinary notice and the eventual termination, the but-forization of that is because he failed to follow instructions and his insubordination. And I will note that the DHRM policy is a Commonwealth-wide policy, 1.60. It's not Old Dominion's policy. And that policy states that when there are two or more active written disciplinary notices, at the Group 2 level, termination is recommended. So ODU's decision to terminate him based on the accumulation of written discipline was based on that policy. So I think the retaliation piece is very clear. The ADA piece, I think, is very clear in the sense of there's a lot of our objective nondiscriminatory factors that cast doubt on his ability to communicate. And I think communication, I know there's some debate in the briefs about whether communication was an essential job function, but the first listed job function is acquiring, passing on, and applying knowledge. And I think that is communication. If it's not, it can only be accomplished by and through communication. And there are numerous other parts in the record that demonstrate that communication is inherent in this job. And I would point the Court's attention to an Eleventh Circuit case. It's Asu Ansa v. Coca-Cola. And it talks about this idea of what is job-related. And it talks about there are listed functions and then there's implicit functions. And in that case, they were talking about the specific in that case was the employee refused to work with others. And the judges on that panel said, okay, that's not listed in his job functions, but that's an essential function of any job that has other employees. You have to work with others. So I would say that in this context, I would say that acquiring, applying, and passing on knowledge is communication, but to the sense that it matters to this panel whether that's listed job function, I would say it's implicitly inherent and it's implicitly essential and it's implicitly key for him to perform every single job task that he had. And it's important to think about this cybersecurity issue and the communication because he was an IT specialist and he was supposed to give support to the entire business college and public affairs college. And people like that don't know about computer. They don't know about network systems. And it's essential to have somebody that can help that university operate. And there are places in the record where his unwillingness to communicate with certain faculty-related results, and he filed several grievances every time this was brought up to him, accusing his direct supervisor of trying to fabricate performance issues to push him out. But that's just not the case. So I would say that communication is extremely essential in this case. And I would even argue that the threat of cybersecurity is a physical threat, but it's not borne out in the opinions because most of those opinions predate today's digital era. But I do think that this court should really pay emphasis on that cybersecurity part of that referral form because that is a legitimate, legitimate business concern that a university would have with a high-level IT professional. At what page does that appear, that particular? I believe it's on 450. I have it here, actually, just in the shortened part. It's on 453. Is the employee considered to be safe, sensitive position? His IT training and skill, his access to the university IT position, place him in a position to cause significant harm to the university operations should he respond to frustration or anger. And inappropriately, the instructional labs that he supports are mission-critical, and his access to the equipment programs and systems leaves the university highly vulnerable. And this comes on the heels of him filing the police report, saying that he was hacked, and then him admitting to the police, oh, I hacked myself because I put trap software to see which records the keystrokes of anybody that logs onto his computer. So I think in his particular role, that particular concern should be noted, and I think that that is the essence of job-related and business necessity with this particular role. If Your Honors don't have any questions, I'd like to rest on brief. Thank you. Thank you. May it please the Court. I'd like to address a couple of things that were raised by counsel for ODU, if I may, unless the Court has other questions. First, with regard to counsel's representation as to the facts, counsel stated at the outset that JA 590 reveals that Mr. Johnson received these documents in advance of his September 2013 grievance. JA 590 and 591 reveals an e-mail string wherein Mr. Johnson began to receive these clock-in and clock-out e-mails. These pages reveal that Mr. Johnson received those in 2014 after he filed. And when you, on your open party argument, you said that when he received those, they revealed that it was, in fact, true that he had been treated differently. What's your support for that? Yes, Your Honors. What it reveals is he didn't believe them. He thought they were fabricated. He believed that he was being treated differently, and he believed that the statements from the university that they were being required to clock in were being fabricated. Okay. So where's your support for when you said that they were being treated differently? Yes, Your Honor. Johnson's supervisor sent e-mails to Johnson and his colleague asking them, telling them they had to clock in. And I'll find the JA site for you, Your Honor. But he requested they both clock in and clock out. And there are e-mails in the record where he asked for that specifically from Johnson. And Johnson's e-mails in the record show that he clocked in in the morning, sent an e-mail, said, I've arrived, and he sent an e-mail in the afternoon. His counterpart was clocking out, sending one e-mail at the end of the day, saying, I arrived this morning at 730. Mr. Johnson was not allowed to send one e-mail. He was sending a morning e-mail, a clock-in e-mail, and a clock-out e-mail. So the way they, and I thought that's what I recalled, that the way Mr. Johnson and his counterpart responded to the same request may have been different. But there's no evidence there was a different request to each of them. That's correct, Your Honor. And all the processes that looked at that, you know, within the university, all concluded that the requirement was not different for Mr. Johnson and his counterpart. Isn't that right? Well, what they responded was, we've looked at it, and you're both being required to e-mail information in with regard to clock in and clock out. Mr. Johnson, as Judge Thacker has noted, didn't believe that he had a reasonable belief that he was being treated differently. I don't know exactly. I'm not Mr. Johnson. I don't know what his belief was at the outset. But what the documents reveal, and it's not exactly relevant to the issue before the court, because this court has said repeatedly, as long as you have a reasonable belief that you're being discriminated against, that is sufficient. But the e-mails show that he was, whether the university was requiring it or if they were just both e-mailing differently, they were clocking in and clocking out in a different manner. And those were the documents that he was attempting to obtain through. They were ordered, the university was ordered to provide them, correct? Yes, Your Honor. And finally, they did provide them, and according to their referral, the university complied with the order to provide the documents, and the employee questioned their authenticity and demanded metadata from the IT department to be sure the documents had not been fabricated or altered. Right? That's correct, Your Honor. That's correct. If I may, Judge Diaz, you asked a question with regard to this being summary judgment, and I think that is the critical question here. ODU talks about what Mr. Johnson has to prove. I would reiterate, as we said in our brief, at summary judgment, it is a reasonable jury, the court has to look at what a reasonable jury could conclude, and a reasonable jury could conclude that Johnson's evidence, that ODU's proffered justifications were not the real reason for firing Johnson, they could conclude that there was enough. A reasonable jury could conclude that the ODU's actual reason for firing Johnson was to retaliate against him for complaining about disparate treatment to his supervisors and his subsequent complaints of ongoing retaliation and his efforts to obtain the relevant documents necessary to prove his claim. At summary judgment, that's all Johnson has to do. There's got to be enough there for a reasonable jury to doubt ODU's proffered reasons. Mr. Waddell says that a jury could only conclude that by focusing, I guess, myopically, on that segment of the record and ignoring the balance, which he went through that laundry list of reasons why the university was concerned about your client. So what about that? Your Honor, I know I'm out of time, but if I may answer your question, this Court has repeatedly said you've got to look at all of the evidence in the record at the summary judgment stage. You cannot focus myopically on one thing, one document. And I will point out that that one document is Kathy Williamson's subjective representations about him being a cyber threat. There's no evidence in the record that he's a cyber threat. There's no evidence that he ever threatened anybody or made some sort of representation that he was going to harm anybody. She asserts that. An assertion based on her subjective belief is not objective evidence that he is a threat or cannot perform his job. The rest of that document, as well as all the other documents, the referral form, the letter to Dr. Sack, the letter to Dr. Johnson, state that he's being referred for this fitness per duty examination because he is engaged in protected activity. And so for that reason and all the other examples that we refer to regarding pretext, we believe that if you look at the record as a whole, there is sufficient evidence that a reasonable jury could conclude that the reasons offered by ODU were pretextual. Thank you, Ms. Metcalf. Thank you. I will note that you've been court appointed to represent Mr. Johnson in this matter, and we appreciate your taking that assignment on. We could not do the important work that we do without lawyers like you who ably represent clients in the fashion that you have today, so thank you very much for that. We'll come down and re-counsel and adjourn for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Albert Diaz, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.